UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
APPLIED INDUSTRIAL MATERIALS CORP.,

                                Petitioner,

OVALAR MAKINE TICARET VE SANAYI, A.S.,
MR. URAL ATAMAN, AND HIS WHOLLY
OWNED OR PARTIALLY OWNED
SUBSIDIARIES.,

                                Respondents.
------------------------------------------------------------------X

05 CV 10540 (RPP)

**OPINION & ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J**.

On February 15, 2006, pursuant to a Stipulated Order of this Court dated January 17, 2006, Petitioner Applied Industrial Materials Corp. ("Aimcor") filed a motion to confirm the arbitration award issued September 22, 2005, and Respondents Ovalar Makine Ticaret Ve Sanayi, A.S. ("Ovalar") and Mr. Ural Ataman ("Ataman") filed a motion to vacate the September 22, 2005 arbitral award. Respondents' motion to vacate is affirmed and Petitioner's motion to confirm is denied.

**I. BACKGROUND**

Aimcor and Ovalar commenced arbitration in 1997 to resolve a dispute over their rights to profits from a joint venture in which Aimcor would purchase and transport to Turkey petroleum coke, which Ovalar would distribute and sell in Turkey. The parties signed a Submission Agreement, which recites that Section 16 of the Joint Venture Agreement provided that any disputes arising during the joint venture be resolved by arbitrators who are "'commercial men' and qualified by the New York Arbitration Society [sic] or its equivalent"[1] and that the parties had "agreed to submit any disputes

---

[1] Apparently there is no organization called the "New York Arbitration Society."

arising out of the J.V. Agreement to arbitration in New York." Submission Agmt., Resp. Ex. 2 at 1.

Paragraph 1 of the Submission Agreement provides that each party select an arbitrator and that the two party-appointed arbitrators select a third arbitrator to serve as Chairman of a Tripartite Arbitration Panel. Id. ¶ 1.

Paragraph 3 of the Submission Agreement provides that:

> Prior to the first hearing or initial submissions, all the arbitrators are required to disclose any circumstance which could impair their ability to render an unbiased award based solely upon an objective and impartial consideration of the evidence presented to the Panel.
> . . .
> Such disclosure shall include relations with any one of:
>     (a) the parties to the arbitration;
>     (b) other affiliates or associated companies of the parties
>     (c) counsel for the parties
>     (d) the other arbitrators on the Panel
>
> No arbitrator shall accept an appointment or sit on a Panel, where the arbitrator or the arbitrator's current employer has a direct or indirect interest in the outcome of the arbitration.
>
> All such disclosed relationships, experience and/or interests must be objected to by the parties at or before the first procedural hearing, or they shall be deemed waived as creating a bias, prejudice or conflict of interest which would warrant overturning the final award in this matter. If a challenge is made to one or more of the arbitrators, the grounds shall be made known to the arbitrators who may withdraw from the Panel and be replaced pursuant to Clause 5 below. If, however, the challenged arbitrator considers the challenge to be without merit and declines to withdraw, the arbitration shall proceed with due reservation of the challenger's right to seek recourse in accordance with Title 9 of the United States Code.

Id. ¶ 3.

Paragraph 4 of the Submission Agreement states: "No person shall serve as an arbitrator who has or who has had a financial or personal interest in the outcome of the

arbitration or who has acquired from an interested source detailed prior knowledge of the matter in dispute." Id. ¶ 4.

The parties each appointed one arbitrator who selected Mr. Charles Fabrikant as the third arbitrator and Chairman. At an initial preliminary hearing held at the American Arbitration Association on September 3, 2003, the Chairman announced that "formal disclosure by the arbitrators will be made subsequent to this hearing." Sept. 3, 2003 Hearing Tr. at 3, lines 14-15, Resp. Ex. 3. On September 3, 2003, the arbitrators were also advised that Aimcor was being sold, that its principal suitor was Oxbow Industries, and that this might be "relevant to the disclosure issue." Id. at 48:21-49:11. [2]

On September 25, 2003, Fabrikant submitted his formal disclosure statement to the parties, stating that:

> The Submission Agreement provides for the arbitrators to fully disclose prior to the first hearing those circumstances that would impair and affect their ability to render an objective and impartial decision. . . . I have had no personal or business relationship with any of the parties to this proceeding, or their affiliates. . . . I have no personal or financial interest in the outcome of this proceeding and see no impediment to my serving on this panel. I reserve the right to amend or add to this disclosure should future circumstances warrant it. . . .

Fabrikant Sept. 25, 2003 letter, Resp. Ex. 4.

During a March 4, 2005 hearing, the Panel suggested and the parties agreed that the proper interpretation of the joint venture agreement should be addressed before consideration of the issue of damages. Mar. 4, 2005 Hearing Tr. at 1364-1371, Pet. Ex., Goldman Aff. Ex. F.

On April 16, 2005, Fabrikant sent an email to the parties, stating:

Gentlemen: it came to my attention yesterday, or day before yesterday that my St. Louis office, which runs our barge operation under the name SCF, has recently

---

[2] A representative from Oxbow later attended a March 1, 2005 hearing, where Fabrikant announced, "this gentleman is here representing Oxbow as a party." Mar. 1, 2005 Hearing Tr. at 447:4-6, Resp. Ex. 5.

3

been engaged in discussions with Ox-Bow of Palm Beach. The subject of conversation is a contract for the carriage of petroleum coke. I had no knowledge of such conversations taking place prior to the past week. I do not participate in contract negotiations or get involved in day to day operations of SCF.

I would like to amend my prior disclosures. At that time I did ask if there had been contacts between my group and these parties and there were none.

I do not plan to become involved in discussions between SCF and Ox-Bow, should there be further conversations between them.

I do not feel my ability to decide this case on the merits is impaired.

Fabrikant Apr. 16, 2005 letter, Resp. Ex. 6.

Prior to the panel's decision on the proper interpretation of the Joint Venture Agreement, Fabrikant made no subsequent disclosures to the parties about his possible conflicts of interest.

On September 22, 2005, the Panel issued an opinion in favor of Aimcor in a vote of 2-1, with Fabrikant casting a majority vote with Aimcor's appointed arbitrator. Sept. 22, 2005 Op., Resp. Ex 7. Ovalar's appointed arbitrator dissented, claiming the opinion was "counter-intuitive." Id. at Dissent of Stephen A. Hochman; See also Nov. 21, 2005 Smit Decl., Resp. Ex. 9.[3]

**Post Opinion Events**

In October and November 2005, Ovalar discovered that SCF, the barge operation of Fabrikant's company, had been engaged in an ongoing commercial relationship to transport Oxbow petroleum coke in barge operations "for about a year." Baker Nov. 18, 2005 Decl., Resp. Ex. 8.[4] Ovalar's investigator, Baker, discovered that "approximately six SCF barges [had] been used in this business involving Oxbow material and SCF

---

[3] This Court did not review the decision of the arbitral panel because it concluded that its decision should not be based on its agreement or disagreement with the conclusions of the arbitral decision.

[4] Ovalar discovered this information through a consultant whom it had retained to inquire into the relationship between SCF and Oxbow. Baker Decl., Resp. Ex. 8 ¶ 2.

4

barges, and that his [source's] tugboat has been pushing this Oxbow/SCF business since before the end of 2004." Id. ¶ 4. Baker was also advised by an SCF employee "that for a lengthy period of time SCF has also been soliciting – so far without success – other river transport business from Oxbow in the upper end of the Illinois River basin." Id. ¶ 7.

On November 21, 2005, Ovalar's counsel sent a letter to Fabrikant outlining the facts newly discovered by Ovalar and asking for Fabrikant's withdrawal from the Panel in view of the "commercial relationships between [Fabrikant's] company, SCF, and Oxbow, one of the parties to this proceeding . . . ." Nov. 21, 2005 letter, Resp. Ex. 10. Ovalar enclosed a declaration, dated November 21, 2005, by Hans Smit, Professor of Law and Director of the Center for International Arbitration and Litigation Law at Columbia University. Nov. 21, 2005 Smit Decl., Resp. Ex. 9.

Fabrikant's response, dated December 5, 2005, stated "I see no reason to withdraw from the panel," and further stated:

> My present recollection is that SCF's relationship with Oxbow came to my attention during a phone conversation with our division President after I referenced the AIMCOR arbitration. Tim Power, president of SCF, informed me that SCF was engaged in discussions with Oxbow. My recollection is that I immediately told Mr. Power that I wished to know nothing about SCF's conversations, or be a party to information about our activities with Oxbow or be consulted concerning any business with them.
> …
> Upon receiving your letter and the attached information I checked with my St. Louis office to ascertain the facts and learned that SCF had indeed chartered 4 barges to Oxbow in December 2004. The charter ended on July 17, 2005. Six barges were chartered to Oxbow on June 23, 2005 and continue to be chartered as of this date. Revenues from inland contracts with Oxbow through October 31, 2005 were $274,770, approximately one-third of one percent of SCF's revenues and an imperceptible fraction of SEACOR's total business.

Fabrikant Dec. 5, 2005 letter, Resp. Ex. 11.

On December 14, 2005 Aimcor filed an action in this Court to confirm the September 22, 2005 opinion, and one week later, on December 21, 2005, Ovalar filed an action seeking the removal of Fabrikant as an arbitrator and to vacate the September 22, 2005 award. The parties agreed by request of the Court to serve motions simultaneously to confirm or vacate the award, and the Court received the parties' initial briefs on February 15, 2006.

**II. DISCUSSION**

*A. Applicable Statutes and Case Law*

Section 10(a) of the United States Arbitration Act states:

 (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
   (1) where the award was procured by corruption, fraud, or undue means;
   (2) where there was evident partiality or corruption in the arbitrators, or either of them;
   (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
   (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

The Supreme Court, in Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145 (1968), addressed the meaning of "undue means" and "evident partiality." In Commonwealth, the Court set aside a unanimous arbitration award after it was discovered that a supposedly neutral arbitrator had an undisclosed previous business relationship with the prevailing party in the arbitration, who had paid the arbitrator about $12,000 in fees, "and the relationship even went so far as to include the rendering of

services on the very projects involved in [the arbitration]." Id. at 146. Justice Black, writing for the plurality, took the position that because of general non-appealability of the decisions, arbitrators should be held to at least as high a standard as judges, and "must avoid even the appearance of bias." Id. at 149-150.

As the Second Circuit has pointed out in Morelite Const. v. N.Y.C. Dist. Council Carpenters, 748 F2d. 79, 82 (1984),[5] "[f]our justices, however, do not constitute a majority of the Supreme Court" and Judge Kaufman thereafter recites an excerpt from Justice White's concurrence in Commonwealth to demonstrate that a majority of the Court concluded that the standards of conduct for arbitrators need not be the same as those for judges. Though Judge Kaufman's focus was that Justice Black's statements should not apply in Morelite, Justice White's concurrence concluded that the arbitrator's previous commercial relationship with the prevailing party, and his failure to disclose that relationship, required vacating the arbitral decision. Commonwealth, 393 U.S. at 150-152.

Justice White's concurrence focuses on the need for full disclosure as a means of avoiding judicial intervention or enforcement. Commonwealth, 393 U.S. at 151. He states:

> In many cases the arbitrator might believe the business relationship to be so insubstantial that to make a point of revealing it would suggest he is indeed easily swayed, and perhaps a partisan of that party. But if the law requires the disclosure, no such imputation can arise. And it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his

---

[5] In Morelite, Judge Kaufman held that "evident partiality within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." Id. at 84 (vacating an arbitration award where there was a father-son relationship between an arbitrator and the President of an international labor union, a district union of which was a party to the arbitration). Judge Kaufman also noted that "the standards for disqualification of arbitrators have been held to be less stringent than those for federal judges." Id. at 83.

7

objectivity, than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award. The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business."

Id.

Justice White concluded:

[I]t is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award.

Id at 151-152.

Thus Justice White as well as Justice Black found nontrivial an undisclosed business relationship – between a party to the litigation, the prime contractor on a painting job, and the supposedly neutral third arbitrator, an engineering consultant on building construction projects – involving sporadic fees totaling approximately $12,000 over four or five years, for dealings that had stopped approximately a year before the arbitration but which had included services on the "very projects involved" in the dispute. Id. at 146.

*B. Submission Agreement*

In the case at bar, the parties entered a Submission Agreement that states the expectations of the parties regarding disclosure of the arbitrators.

The Submission Agreement provides for disclosure at the outset of arbitration, as envisioned by Justice White in Commonwealth, supra, and it states that "[p]rior to the

8

first hearing or initial submissions," the arbitrators would disclose relations with the parties or affiliates, and that "[n]o arbitrator shall <u>accept an appointment or sit on a Panel</u>, where the arbitrator or the arbitrator's current employer has a direct or indirect interest in the outcome of the arbitration." Submission Agmt., Resp. Ex. 2 ¶ 3 (emphasis added). The Submission Agreement continues, "All such disclosed relationships, experience and/or interests must be objected to by the parties at or before the first procedural hearing, or they shall be deemed waived as creating a bias, prejudice or conflict of interest which would warrant overturning the final award in this matter." Id.[7]

1. Text of the Agreement

By its terms, the Submission Agreement does not provide procedures for subsequent disclosure by the parties, e.g., where business relationships formed subsequent to the initial hearings arise that might affect the partiality and/or interests of the arbitrators, or where the nature of such a relationship is discovered only after the proceedings begin. However, the text of the Submission Agreement does suggest the parties desired ongoing arbitral impartiality. The language "No arbitrator shall accept an appointment or sit on a Panel, where the arbitrator or the arbitrator's current employer has a direct or indirect interest in the outcome of the arbitration" (Submission Agmt., Resp. Ex. 2 ¶ 3) suggests that "sit" must mean something different than "accept an appointment." Similarly, the language "No person shall serve as an arbitrator who has or who has had a financial or personal interest in the outcome of the arbitration or who has acquired from an interested source detailed prior knowledge of the matter in dispute" in the next paragraph of the agreement implies an expectation of ongoing impartiality. Id. ¶

---

[7] This initial disclosure was actually made following the first hearing, as Fabrikant stated at the first preliminary hearing that "[f]ormal disclosure by the arbitrators will be made subsequent to this hearing." Sept. 3, 2003 Hearing Tr. at 3, Resp. Ex. 3.

9

4. Thus it appears that the parties contemplated that the arbitrators would remain without a direct or indirect interest in the outcome of the arbitration, and overlooked the need for a provision in the Submission Agreement dealing with the development in the future of a relationship between an arbitrator and one of the parties.

2. Subsequent Actions and Understandings by the Parties

Fabrikant's initial and follow-up disclosures to the parties suggest that he too interpreted the Submission Agreement as requiring ongoing disclosure on his part, and he made it clear to the parties that he intended to amend his disclosure if future issues arose.

Fabrikant's initial disclosure by letter on September 25, 2003 acknowledges the Submission Agreement and his duty to disclose information under it. Fabrikant Sept. 25, 2003 letter, Resp. Ex. 4; see supra Part I. Additionally, by stating in the September 25, 2003 letter that he "reserve[d] the right to amend or add to this disclosure should future circumstances warrant it," Fabrikant communicated to the parties that he would continue to disclose to them new disclosure information if the facts of his submission changed. Id.

Fabrikant's April 16, 2005 email amended his original disclosure regarding his relations with the parties in order to alert them as to the possibility of a future commercial relationship between his company and one of the parties. Fabrikant Apr. 16, 2005 letter, Resp. Ex. 6. This amended disclosure would lead a party to believe that Fabrikant would notify them if any contractual relationship developed.[8] The fact that Fabrikant chose to disclose these details demonstrates that he viewed even the initiation of business

---

[8] Petitioners argue that Respondents waived their current bias claim by not responding to Fabrikant's April 16, 2005 letter. Pet. Mot. to Confirm at 2. This argument is unavailing because the parties could not have waived an objection to a relationship that, according to Mr. Fabrikant's April 16, 2005, had not been formed. Additionally, as discussed supra, it was reasonable for Ovalar to rely on Fabrikant's earlier statement that suggested he would continue to amend or add to his disclosures "should future circumstances warrant it." Sept. 25, 2003 letter, Resp. Ex. 4. Attorneys to litigation are normally loathe to suggest recusal without clear grounds to do so.

10

"discussions" between his company and one of the parties as contemplated by the disclosure requirements of the Submission Agreement.[9]

It is reasonable, considering the Submission Agreement and Fabrikant's own disclosure statement, that the parties would rely on Fabrikant to continue to provide them with information should there be a relevant change in his relationships or in the event he discovered that he had misstated the facts in his disclosure.

Instead, as Fabrikant's letter of December 5, 2005 revealed for the first time, Fabrikant, in his email of April 16, 2005, failed to disclose to the parties that a contract between SCF and Oxbow for the transport of petroleum coke had existed for the past four months and that he had taken steps to shield himself from receiving future information about SCF's relationship with Oxbow Industries. See Fabrikant Dec. 5, 2005 letter, Resp. Ex. 11. Fabrikant's December 5, 2005 disclosed that he told his division President Tim Power that he "wished to know nothing about SCF's conversations, or be a party to information about our activities with Oxbow or be consulted concerning any business with them." Id. By so instructing Power, he prevented himself from further disclosures of his company's relationship with Oxbow/Aimcor.[10] Whatever the reason, Fabrikant, in his April 16, 2005 email, failed to notify the parties that SCF had been doing business with Oxbow and was continuing to do business with Oxbow. Though it is likely that there may have been no intent to avoid disclosure on the part of Fabrikant, lack of intent does not bear on the Court's conclusion.

*C. Policy*

---

[9] Fabrikant had already met with the parties prior to his initial disclosure and had the opportunity to discuss the expected standard of disclosure with them.
[10] Aimcor/Oxbow also did not disclose that in fact it had entered into a contract with Fabrikant's company.

11

A policy of full disclosure is consistent with a policy of disclosing business relationships between the arbitrators and the parties both before and during the arbitration process. Reason dictates that there must be a continuous obligation on the part of the arbitrator to avoid partiality or the appearance of partiality. It defies common sense to suggest that only the business relationships entered into <u>before</u> arbitration might affect the fairness of the arbitration process, and that any business relationships pursued or entered into after that first hearing would not have an influence on the arbitration process.[11]

The commercial relationship between a company controlled by the arbitrator and one of the parties creates an obvious risk of partiality and creates an appearance of partiality on the part of the arbitrator, as Justices Black and White agreed. The appearance of impartiality on the part of the arbitrator is further undermined by his and Oxbow's failure to disclose it when it occurred.

The American Arbitration Association Code of Ethics for Arbitrators in Commercial Disputes[12] requires disclosure by arbitrators as soon as practicable, at any stage of the arbitration. Under the heading "An Arbitrator Should Uphold the Integrity and Fairness of the Arbitration Process," Canon I, Part C of the Code of Ethics states in pertinent part:

> After accepting appointment and while serving as an arbitrator, a person should avoid entering into any business, professional, or personal relationship, or

---

[11] Since the parties have elected not to engage in discovery in this case, there is no evidence that 1) Aimcor/Oxbow initiated the business conversations hoping to influence the arbitral decision; 2) that SCF initiated these conversations in order to gain a competitive advantage over other barge operators seeking Oxbow business by the fact that Fabrikant was the arbitrator in a dispute in which Oxbow had an interest; or 3) that the relationship developed with or without any such intent. In fact there is no evidence that Fabrikant was aware of SCF's contract with Oxbow.

[12] The Code of Ethics was effective March 1, 2004. It was originally prepared in 1977 and revised in 2003 by an ABA Task Force and special committee of the AAA. Code of Ethics for Arbitrators in Commercial Disputes, American Arbitration Association, <u>available at</u> http://www.adr.org/sp.asp?id=21958.

> acquiring any financial or personal interest, which is likely to affect impartiality or which might reasonably create the appearance of partiality. For a reasonable period of time after the decision of a case, persons who have served as arbitrators should avoid entering into any such relationship, or acquiring any such interest, in circumstances which might reasonably create the appearance that they had been influenced in the arbitration by the anticipation or expectation of the relationship or interest. Existence of any of the matters or circumstances described in this paragraph C does not render it unethical for one to serve as an arbitrator where the parties have consented to the arbitrator's appointment or continued services following full disclosure of the relevant facts in accordance with Canon II.

Code of Ethics for Arbitrators in Commercial Disputes, supra at n. 3.

In Canon II, under the heading "An Arbitrator Should Disclose Any Interest or Relationship Likely to Affect Impartiality or Which Might Create an Appearance of Partiality," the Code of Ethics makes clear that the arbitrator's duty to disclose is an ongoing duty:

> C. The obligation to disclose interests or relationships described in paragraph A is a continuing duty which requires a person who accepts appointment as an arbitrator to disclose, as soon as practicable, at any stage of the arbitration, any such interests or relationships which may arise, or which are recalled or discovered.
>
> D. Any doubt as to whether or not disclosure is to be made should be resolved in favor of disclosure.

Id. at Canon II, Part C-D.

The International Bar Association has also promulgated similar guidelines for arbitrators. The IBA Guidelines on Conflicts of Interest in International Arbitration were approved on May 22, 2004, by the Council of the International Bar Association.[13] The Guidelines are intended to aid "parties, practitioners, arbitrators, institutions and the courts in their decision-making process on these very important questions of impartiality, independence, disclosure, objections and challenges made in that connection." Id. at Introduction ¶ 6.

---

[13] The IBA Guidelines are available at: http://www.ibanet.org/images/downloads/guidelines%20text.pdf.

General Standard 3 of Part I the IBA Guidelines, titled "Disclosure by the Arbitrator," states in pertinent part:

> (a) If facts or circumstances exist that may, in the eyes of the parties, give rise to doubts as to the arbitrator's impartiality or independence, the arbitrator shall disclose such facts or circumstances to the parties, the arbitration institution or other appointing authority (if any, and if so required by the applicable institutional rules) and to the co-arbitrators, if any, prior to accepting his or her appointment or, if thereafter, as soon as he or she learns about them.
>
> . . .
>
> (c) Any doubt as to whether an arbitrator should disclose certain facts or circumstances should be resolved in favour of disclosure.
>
> (d) <u>When considering whether or not facts or circumstances exist that should be disclosed, the arbitrator shall not take into account whether the arbitration proceeding is at the beginning or at a later stage.</u>

Id., Part I, General Standard 3, at 9-10 (emphasis added).

The IBA Guidelines also outline disclosure duties of the parties to the arbitration. General Standard 7 of Part I the IBA Guidelines, titled "Duty of Arbitrator and Parties" states as follows:

> (a) A party shall inform an arbitrator, the Arbitral Tribunal, the other parties and the arbitration institution or other appointing authority (if any) about any direct or indirect relationship between it (or another company of the same group of companies) and the arbitrator. The party shall do so on its own initiative before the beginning of the proceeding or as soon as it becomes aware of such relationship.
>
> (b) In order to comply with General Standard 7(a), a party shall provide any information already available to it and shall perform a reasonable search of publicly available information.
>
> (c) An arbitrator is under a duty to make reasonable enquiries to investigate any potential conflict of interest, as well as any facts or circumstances that may cause his or her impartiality or

14

> independence to be questioned. <u>Failure to disclose a potential conflict is not excused by lack of knowledge if the arbitrator makes no reasonable attempt to investigate.</u>

<u>Id</u>., Part I, General Standard 7, at 15-16 (emphasis added).

Thus under these guidelines Mr. Fabrikant's failure to investigate the status of SCF's negotiations with Oxbow and his subsequent lack of knowledge do not excuse his lack of disclosure.

It is important that courts enforce rules of ethics for arbitrators in order to encourage businesses to have confidence in the integrity of the arbitration process, secure in the knowledge that arbitrators will adhere to these standards. In the years since Justice Black's decision, international arbitrations have taken on an extremely important role in facilitating international commercial transactions among businesses located in all parts of the world. Businesses in many countries are wary of the courts favoring the party resident within their jurisdiction and favor an independent arbitral panel for the prompt resolution of any commercial dispute. Confidence in the arbitral panel to render fair and impartial decisions is important to this country's international trade, and full disclosure is integral to the integrity of the panel's decision. Because of the increase in international transactions and the corresponding increase in disputes it is crucial that there exist a requirement of an appearance of impartiality in arbitrations conducted in this jurisdiction, and that courts take actions designed to assure foreign entities that arbitrations in the United States are free from the suggestion of partiality.

**CONCLUSION**

In light of the broad standards for disclosure that the parties outlined in their Submission Agreement, Fabrikant's continued understanding, as evidenced by his letters

to the parties, that his full disclosure regarding his relationship to Aimcor/Oxbow was called for under the Submission Agreement, and the standards for arbitrators set forth by the American Arbitration Association in the Code of Ethics for Arbitrators in Commercial Disputes, as well as the IBA Guidelines on Conflicts of Interest in International Arbitration, Fabrikant's nondisclosure of SCF's contracts with Oxbow for over $274,770 in revenue requires that the arbitral award be vacated.

For the foregoing reasons, Aimcor's petition to confirm is denied and Ovalar's petition to vacate the arbitration award is granted.

IT IS SO ORDERED.

Dated: New York, New York
June 2⁵, 2006

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Opinion and Order sent to:

*Counsel for the Petitioner*
Daniel B. Goldman
Sarah North
Paul, Hastings, Janofsky & Walker LLP
75 East 55th St.
New York, NY 10022
Tel: 212-318-6000
Fax: 212-230-5192

Anthony Mavronicolas
75 Washington Place, Suite 1
New York, NY 10011
Tel: 212-253-6040

*Counsel for the Respondents*

16

Jeffrey Kessler
David Feher
Michael Thelen
Dewey Ballantine, LLP
1301 Ave. of the Americas
New York, NY 10019
Tel: 212-259-8000
Fax: 212-259-6333